LEAR, Judge.
Mr. John T. Spears, a resident of Eunice, Louisiana, brings this suit against Mrs. Chester C. Danehower, Chester C. Dane-hower, Jr., her son, and United States Fidelity & Guaranty Company, the liability insurer of the motor vehicle owned by Mrs. Chester C. Danehower, but being driven by her son on the occasion in question.
The petition alleges that on the night of September 30, 1961, plaintiff was operating his Chevrolet automobile in a southwesterly direction preparing to enter the Airline Highway after having left the Scenic Highway in the Parish of East Baton Rouge.
It is alleged and proved that the Dane-hower automobile struck petitioner’s vehicle in the rear at this point. It is further alleged that such collision caused petitioner to suffer serious injuries consisting in part of a sprain and injury of the lower lumbar region, primarily to the left with associated secondary nerve root irritation unto the left lower extremity and a protrusion or disc displacement of the fourth or fifth lumbar discs.
The petition continues by alleging that these injuries have occasioned disability to petitioner and states that petitioner “has suffered much mental and physical pain and suffering will continue to do so for a long period of time.” Plaintiff then asks for judgment in the sum of $110,341.81, itemized as follows:
Medical Expense $ 741.81
Estimated Future Medical Expense 2000.00
Physical Pain, Suffering and Mental Anguish 25,000.00
Future Physical Pain, Suffering and Mental Anguish 25,000.00
Loss of Earnings and Earning Ability 57,600.00
Defendants denied the negligence of Chester C. Danehower, Jr. and, alternatively setting forth the alleged contributory negligence of plaintiff, prayed for a dismissal of the suit as to all defendants.
Inasmuch as Mrs. Chester C. Danehower was not present in the automobile at the time of the accident, petitioner consented that suit be dismissed as to her on motion for summary judgment. The suit remains against Chester C. Danehower, Jr. as an omnibus insured and United States Fidelity & Guaranty Company as the insurer.
Judgment was rendered in favor of the plaintiff for the sum of $5,000.00 together with an additional $913.97 which the Trial Court found to be the medical and hospital expenses of petitioner incurred to the date of trial. Plaintiff’s demand for loss of wages was rejected by the Lower Court.
Plaintiff appealed from this judgment asking for an increase in the award. Defendants answered the appeal again urging the want of negligence on the part of Danehower, the contributory negligence of Spears, and, in the alternative, seeking a reduction in the award.
On the night in question there had been an L. S. U. football game and the occupants *467 of both automobiles had attended the event. The evidence is conclusive that traffic was very heavy at the site of the accident, which was a curved ramp or approach feeding traffic from Scenic Highway into a cloverleaf exchange and thence on to the Airline Highway. The entrance into the Airline Highway is at a relatively sharp angle which necessitates the driver of a vehicle looking back over his left shoulder to make sure that he can enter the Airline Highway in safety. The physical layout of the highway, coupled with the extremely heavy traffic conditions, required the driver of automobiles to exercise the utmost care. The evidence clearly shows that Mr. Dane-hower was looking back down the Airline Highway and ran into the rear of the Spears automobile in such manner that he and his insurer must be responsible for the results thereof.
Defendants were required to prove by a preponderance of the evidence that Mr. Spears was guilty of negligence contributing to this accident in order to achieve a dismissal. This, they have failed to do. The evidence clearly shows that Mr. Spears had brought his vehicle to a stop several moments before the impact while awaiting a break in the Airline traffic which would enable him to proceed. As the trial judge put it, “* * * there is no evidence to show that any act of plaintiff contributed to the accident.”
A determination of the results, however, is not as easily disposed of.
Mr. Spears alleges that his collision caused him to suffer a back injury. He was asked:
“Q. An when did you first notice that injury, Mr. Spears ? ”
“A. Well, I didn’t notice there was too much pain at first, and, I just noticed that it was tense on the way back, and had a strange feeling in my back, and I kept on and it didn’t get any worse, and I never thought too much of it. I felt sore and the more I worked the worse it got, so finally I went over to see a physican — my family physican.”
Petitioner went to see Dr. Sylvan J. Manuel, a general practitioner in Eunice, who had known Mr. Spears all of his life. His first visit to Dr. Manuel was November 20, 1961, some seven weeks after the collision complained of.
Dr. Manuel testified that Mr. Spears contacted him with his chief complaints being pain in his back and with pain down his left leg. Dr. Manuel examined the plaintiff and found that plaintiff had “a lot of spasms on the left side of his lumbar-sacral area”. It further seemed to Dr. Manuel that plaintiff’s reflexes on the left side were decreased. His immediate diagnosis was “lumbar-sacral sprain verus a possible disc.”
Though Dr. Manuel saw plaintiff on other occasions and persisted in his opinion that plaintiff had suffered a possible disc, he referred the patient to Dr. Charles B. Hatchette, an orthopedic surgeon of Lake Charles, Louisiana.
Dr. Hatchette first examined Mr. Spears on November 30, 1961 at which time he did not suspect any disc involvement nor did he consider that any of petitioner’s complaints were related to the accident of September 30.
On the contrary, Dr. Hatchette found a congenital shortening of the left leg which could cause a muscular or posture imbalance resulting in the patient’s complaints. The doctor recommended that Mr. Spears raise the heel of his left shoe about % of an inch and thought at the time that this would bring about the necessary relief.
Mr. Spears returned to Dr. Hatchette July 2, 1963 with a history of increased symptomology. On the second examination Dr. Hatchette found additional subjective symptoms and further found that the left calf measured IS inches as compared to 15J4 inches of the right calf. He classified this *468 as atrophy and this factor, coupled with certain subjective symptoms, lead him to believe that Mr. Spears could be suffering from a nerve root irritation and recommended a myelogram for further diagnosis. He further pointed out that a person with a congenital shortening of one leg can very easily accommodate to it and not suffer any pain or other symptoms. On the other hand he pointed out that a lumbar-sacral injury to a person with this defect can cause an aggravation which prolongs the period of recovery.
Plaintiff was also examined by Dr. Moss M. Bannerman, an orthopedic surgeon and Dr. Joseph M. Edelman, a neurosurgeon.
Dr. Bannerman’s examination did not result in a definite diagnosis. He stated that the straight leg raising test, the difference in the measurement of the plaintiff’s calves and the'patient’s description of his subjective symptoms were suggestive of a nerve root irritation which could possibly be caused by a herniated disc and he also felt that a myelogram was indicated for further determination.
■ Dr. Edelman could find absolutely nothing wrong with the patient nor did he find any possibility of a disc involvement or nerve root irritation of any kind. He absolutely rejected any suggestions that the difference in the measurement of the calves was atrophy connected with a loss of nerve supply to the muscles.
At this time it might be pointed out that all doctors had access to x-ray examinations and that no x-ray taken of plaintiff’s lumbar region showed any fractures, dislocations, degenerative changes or disc interspace narrowing. Of course these negative x-ray findings do not rule out a herniated disc or other nerve root irritation.
The doctor who saw Mr. Spears most often and who administered to him most thoroughly was Dr. George P. Schneider, an orthopedic surgeon of Lake Charles, Louisiana.
. Dr. Schneider, as a result of his initial examination, “felt that Mr. Spears showed definite manifestations of a spraining injury to the lower lumbar region, primarily to the left with associated secondary nerve root irritation into the left lower extremity. It was my feeling that the two possibilities existing were those of a residual facetitis with secondary irritation of the underlying nerve root or possibly án early protrusion of the 4th or Sth lumbar disc on the left side giving rise to direct pressure on the nerve root.”
As a result of this Dr. Schneider hospitalized Mr. Spears for a period of approximately -17 days where he was given a completely conservative routine which resulted in some improvement.
Dr. Schneider’s first examination was on March 2, 1962. He hospitalized the patient on March 9, 1962 and was the attending physican during the patient’s stay. After that Dr. Schneider saw Mr. Spears 21 times, which extended to just a few days before this matter was called to trial. As a result of this extended association with the patient, Dr. Schneider does not rule out the possibility of a disc protrusion, but assigns other factors which may be determinative of the patient’s complaints. He had this to say: “A. My diagnosis is basically unchanged cause I feel that this patient has continued to exhibit manifestations of a lower back injury with secondary nerve root involvement, arising primarily at the 4th or Sth lumbar segment of the left side and the residual manifestations of root irritation into the left lower extremity could be associated with a protrusion, it could be associated with a tear of the ligament of flavum with secondary thickening of the structure, nerve root adhesions, that could be associated with as I previously described a chronic facetitis or irritation and thickening about the joint with secondary irritation of the underlying nerve root. I feel that at this time and have felt for a considerable period of time that the patient is definitely in need of surgical treatment of this prob *469 lem. I feel that that is the only thing that will eventually resolve this problem.”
The Trial Judge found that there was "a consistency and ring of truthfulness in plaintiff’s complaints” and felt that taking the evidence as a whole the plaintiff proved his case by a fair preponderance of the evidence.
This Court agrees with that conclusion.
The evidence shows that if plaintiff would submit to surgical correction the chances for a complete recovery are in the neighborhood of 80% to 90%. But plaintiff does not desire surgery, except as a last resort, and would not even submit to the myelogram which, of course, is to some extent surgical in its procedures.
Plaintiff admits that there are periods of remission in his discomfort and there is further evidence to support the opinion of this Court that conservative treatment often results in a complete cure of this type of complaint and that in many instances a complete remission of the trouble occurs spontaneously and in such a manner that it cannot be explained by medical science.
Recognizing these factors, the Trial Judge awarded plaintiff the sum of $5,000.-00 plus medical expenses to date of trial.
No award was made for loss of wages. Plaintiff was the owner and operator of a lounge in Eunice. He testified that he tended bar, stacked beer cases and did the other things necessary for operation of an establishment of that type. He sold this lounge in April, 1962, some six months after the accident, and attributed the necessity for the sale to his disability resultant from the accident. However, at the time of the trial, he was gainfully employed as a milk inspector and, as such, had a good work record with no time lost for physical or health reasons.
The trial court did not feel, nor does this Court, that plaintiff established with sufficient certainty that the loss of business and the ultimate sale of his lounge was inextricably connected with his injury. Many other factors, economic, legal or social, or a combination thereof, could have been the principal reason for his disposing of his lounge. He did not rule these out.
The Judge below dismissed this phase of the claim in summary fashion, thusly: “The court does not feel he has suffered any loss of income as a result of the accident”. We know that our trial colleague reached this conclusion only after a careful and serious consideration of all testimony and evidence on this point and we are not prepared to say that he abused the “much discretion” vested in him in this respect just as we are not prone to disturb his other findings and award.
Affirmed